The appeal is from an order of the Circuit Court of Etowah County placing permanent custody of a four year old child in the State Department of Pensions and Security (hereinafter DPS) and terminating the parental rights of the mother and father. The mother appeals.
On March 2, 1977 DPS filed a petition in the Juvenile Court of Etowah County seeking permanent custody of Ricky Lamar Miller. Thereafter the parents of the child filed their own petition seeking his custody. A hearing was held on April 28, 1977 on these petitions. Subsequent to the hearing and before a ruling by the trial court, a conference was had between the parties and the court. The family was given six months to rehabilitate itself and to show the court that a stable, healthful family environment could be established. Should this be done, the child would be returned to the parents. On October 6, 1977 the juvenile court awarded permanent custody to DPS.
On October 13, 1977 the parents appealed the order to the circuit court. The parents filed a motion for summary judgment and a motion for a more definite statement as to why their child was being taken from them. Both motions were denied.
This cause came on for hearing on the merits on July 26, 1978, at which time the mother moved to amend the petition for custody to show that she alone was asking for permanent custody. After a de novo hearing, the court issued its final order, which found that:
 Ricky Lamar Miller is a child under sixteen (16) years of age and is a resident or physically located within Etowah County; that the child is neglected and/or dependent within the meaning of Alabama law and that the parents are unable to provide a suitable and stable home environment for the child; that the child is in need of and entitled to the care and protection of this Court and the State of Alabama and that the morals, health and general welfare will be best served by granting permanent care, custody and control of the child to the Department of Pensions and Security of the State of Alabama, and that said department is equipped to care for and has agreed to receive the child, if committed by final order of this Court.
The record shows that DPS gained temporary custody of Ricky in August 1974, when he was two months old. The record further discloses that the father, while in an intoxicated condition, took the child to the father's mother's house. An argument ensued resulting in violence to the grandmother. An ambulance came for the grandmother and the police found the child in the house unattended and in a lifeless condition. The police turned the child over to DPS. Not knowing the whereabouts of the mother, DPS obtained permission from the juvenile court to place the child in a foster home until other arrangements could *Page 1373 
be made. The next day the parents contacted DPS about their child. After a preliminary investigation and talking to the parents, DPS decided not to release the child to the parents at that time. A hearing was held before the juvenile court several days later and the judge informed the parents that the child would be returned to them if certain conditions were met. The conditions were never met, and the child was never returned to the parents' custody.
Testimony in the record shows that the mother and father have a long history of family arguments and fights, separation and reconciliation. The husband testified that during their short marriage, his wife had left him no less than fifty times, always coming back however. The father's testimony revealed that he has struck his wife on occasions when he had been drinking and they got into arguments. The mother had talked about divorce on several occasions when they had separated, but nothing came of this talk.
The record shows that the father has a serious drinking problem. He has been in and out of the United States Veterans' Administration hospitals seven or eight times for treatment of alcoholism. Also, he has been placed in jail many times for drunkenness. The testimony of the Millers was that in a three year span during the marriage, Mr. Miller had been in jail forty-two times. At the time of the hearing the father was in jail, and otherwise lived in a motel; the mother was living with relatives.
The father's employment record, as well as the mother's, is dismal. The testimony revealed that neither of the parents had held a job for more than a few months at a time. And, neither parent was employed at the time of the hearing in the circuit court.
The social workers employed by DPS testified that at the direction of the juvenile court, the parents had been told many times what they needed to do to rehabilitate their family so that the child could be returned to them. It was suggested that the father stop drinking, obtain regular employment, establish a more harmonious relationship with his wife, and, if necessary, seek counseling for his drinking problem. For the most part, these suggestions were ignored according to the social workers. Although the parents did contact DPS occasionally, most of the contacts with the parents were initiated by DPS; and, there were long periods when DPS had no knowledge of the whereabouts of the parents and could not get in touch with them to see if the conditions laid down by the juvenile court were being met.
The parents very seldom called to inquire about the welfare of the child; however, DPS workers did arrange for the parents to visit with the child so as to establish some familial rapport between them.
The record is replete with instances where not only the juvenile judge counseled with the parents but also where the DPS workers made extensive efforts to get the parents to establish a home to which the child could be returned. The recommendations made by the court and DPS for the establishment of a family environment that would warrant returning the child to the Millers were never met.
There are six issues raised in the mother's brief. The first two issues question the constitutionality of the juvenile code on the grounds that the termination of the parent-child relationship is permitted for reasons less compelling than required by the United States Constitution and that the code is unconstitutionally vague. See §§ 12-15-1 through 12-15-120, Code of Alabama 1975.
As to the first issue, the mother argues the constitutional standard to be applied when a parent-child relationship is terminated is a "harm standard" rather than the "best interests and welfare" standard ordinarily used in child custody cases. For this proposition the mother relies on the case of Roe v.Conn, 417 F. Supp. 769 (M.D.Ala. 1976). Roe states:
 The State's interest, however, would become "compelling" enough to sever entirely the parent-child relationship only when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing. [Footnote omitted.] *Page 1374 
DPS says that Roe does not apply to this case because the child in question is a "dependent child" within the meaning of the juvenile code, and Roe did not speak to "dependent" children.
Roe found that Title 13, §§ 350 and 352, Code of Alabama 1940 were unconstitutional as they applied to "neglected" children and that, as an alternative ground, the code provisions were unconstitutionally vague.
We have held that Roe applies only to "neglected" children and not to "dependent" children. Hunley v. Houston County,Alabama Dept. of Pensions and Security, Ala.Civ.App.,365 So.2d 81 (1978). We have also said that should Roe be construed to apply to "dependent" children, we would not be bound by that decision. Smith v. State Dept. of Pensions and Security, Ala.Civ.App., 340 So.2d 34 (1976).
The standard that has been applied by the courts of this state in child custody cases even where the state is involved is the best interests of the child. Lovell v. Department ofPensions and Security, Ala.Civ.App., 356 So.2d 188 (1978). We also said in that case that the parents have a prima facie right to the custody of their child but that this right is not absolute and must yield to the superior requirement of what is in the best interests and welfare of the child.
In deciding what is in the best interests of a child who is the subject of a custody dispute, the courts of this state consider many factors, among which would be conduct of the parents toward the child, family environment, health of the child, physical and emotional abuse of the child, abandonment of the child, love of and interest in the child by the parents, and activities of the parents that would be detrimental to the safety and welfare of the child. Foremost among the listed factors, especially in a situation where the state is seeking a termination of parental rights, would be less drastic measures than permanent removal of parental custody. Lovell, supra. For example, a court would certainly consider returning the child to parental custody on a trial basis subject to certain definite conditions being met and subject to supervision by DPS workers or other trained personnel; or temporary custody in a foster home with specific visitation with the child and conduct requirements to be met by parents; or that the parents are to be deprived of custody temporarily pending a correction of deficiencies in the home environment that were having or would have a harmful effect on the child should the child be placed back in the family relationship.
In the case at bar it is quite obvious from the record that the use of less drastic measures than permanent deprivation of custody was tried on many occasions and absolutely no cooperation was obtained from the parents. And, this effort by the juvenile court and DPS went on for almost four years.
It cannot be seriously contended by the appellant in this case that every effort was not made by the state to rehabilitate her family so that it could again exercise familial rights and responsibilities toward the child in question.
Furthermore, when the evidence is closely examined it becomes quite apparent that the trial court correctly decided to award permanent custody to DPS. The evidence indicated the child's family had demonstrated over a long period of time that it was unstable in that neither parent could stay employed for any length of time; that the family was continually moving from place to place due to the lack of money and to the disturbances caused by the excessive drinking of the father and the consequent arguments and fights between the parents; that the mother continually called on the police to place the father in jail; and that the parents continually separated and reconciled. This and other evidence of record supports the trial court's conclusions that the child is in need of the care and protection of the state, and that the child's morals, health, and general welfare would best be served by granting permanent custody to DPS.
The second issue raised by appellant concerns the alleged vagueness of certain portions of the Alabama Juvenile Proceedings *Page 1375 
Statute, Code of Alabama 1975, § 12-15-1 through § 12-15-120. This attack on the constitutionality of these statutes centers principally on § 12-15-1 (10) which defines "dependent child," and on § 12-15-71 which provides for the disposition of children found to be dependent.
Section 12-15-1 (10) reads:
(10) DEPENDENT CHILD. A child:
 a. Who, for any reason is destitute, homeless or dependent on the public for support; or
 b. Who is without a parent or guardian able to provide for his support, training or education; or
c. Whose custody is the subject of controversy; or
 d. Whose home, by reason of neglect, cruelty or depravity on the part of his parent, parents, guardian or other person in whose care he may be, is an unfit and improper place for him; or
 e. Whose parent, parents, guardian or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical or other care necessary for such child's health or well-being; or
 f. Who is in such condition or surroundings or is under such improper or insufficient guardianship or control as to endanger his morals, health or general welfare; or
 g. Who has no proper parental care or guardianship; or
 h. Whose parent, parents, guardian or custodian fail, refuse or neglect to send such child to school in accordance with the terms of the compulsory school attendance laws of this state; or
 i. Who has been abandoned by his parents, guardian or other custodian; or
 j. Who is physically, mentally or emotionally abused by his parents, guardian or other custodian or who is without proper parental care and control necessary for his well-being because of the faults or habits of his parents, guardian or other custodian or their neglect or refusal, when able to do so, to provide them; or
 k. Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child; or
 l. Who has been placed for care or adoption in violation of the law; or
 m. Who for any other cause is in need of the care and protection of the state; and
 n. In any of the foregoing, is in need of care or supervision.
Section 12-15-71 reads as follows:
 (a) If a child is found to be dependent, the court may make any of the following orders of disposition to protect the welfare of the child:
 (1) Permit the child to remain with his parents, guardian or other custodian, subject to such conditions and limitations as the court may prescribe;
 (2) Place the child under protective supervision as herein provided or under the supervision of the department of pensions and security;
(3) Transfer legal custody to any of the following:
 a. The department of pensions and security; provided, that said department is equipped to care for the child;
 b. A local public child-placing agency or private organization or facility willing and able to assume the education, care and maintenance of the child and which is licensed by the department of pensions and security or otherwise authorized by law to receive and provide care for such child; or
 c. A relative or other individual who, after study by the department of pensions and security, is found by the court to be qualified to receive and care for the child;
 (4) In the case of any child 14 years of age or older, where the court finds that the school officials have made a diligent effort to meet the child's educational needs and, after study, the court further finds that the child is not able to benefit appreciably from further schooling, the court may: *Page 1376 
 a. Excuse the child from further compliance with any legal requirement of compulsory school attendance; and
 b. Authorize the child, notwithstanding the provisions of any other law, to be employed in any occupation which is not legally declared hazardous for children under the age of 18;
 (5) Make such other order as the court in its discretion shall deem to be for the welfare and best interests of the child;
 (6) In appropriate cases, award permanent custody to the department of pensions and security or to a licensed child-placing agency with termination of parental rights and authorization to place for adoption, without appointing a legal custodian or guardian or guardian of the person, or award temporary custody to the same without appointing a legal custodian or guardian or guardian of the person.
Specifically, the mother contends that the statutory definition of "dependent child," and those terms used in the statute such as "unfit," "improper," and "neglected," are so vague as applied to the proceeding below that they fail to give sufficient warning to individuals such as herself who might be affected by their proscriptions, citing Grayned v.City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222
(1972). She further contends that the phrase "in appropriate cases" appearing in § 12-15-71 grants impermissibly broad powers to the trial court to terminate parent-child relationships.
We find no merit to these contentions. As stated above, both the court and DPS counseled with the parents over a period of years regarding why temporary custody had been given to DPS and regarding specific alternative methods for the establishment of a family environment suitable for raising the child. In view of this uncontradicted evidence, we cannot agree that either Mr. or Mrs. Miller was without notice as to why DPS sought to gain custody of the child.
The phrase "in appropriate cases" is found within the context of a statute which sets forth numerous alternatives for the disposition of a dependent child. We think the presence of these less drastic measures serves to limit and define those instances where the severance of the parent-child relationship may be deemed "appropriate." As pointed out above, a four year attempt to implement one or more of these less drastic measures in the instant case proved futile.
Issues three and five raised by the mother concern her contentions that the trial court's decision is based on inadmissible hearsay; and that absent such testimony the evidence presented to the trial court is insufficient to meet the statutory standard set forth in Code of Alabama 1975, § 12-15-65 (e). That statute requires the trial court, prior to its making a disposition of a dependency case, to find from "clear and convincing evidence, competent, material and relevant in nature, that the child is dependent and in need of care or supervision." She argues that no evidence was presented to indicate that she is unfit or immoral, and cites Thorne v.Thorne, Ala.Civ.App., 344 So.2d 165 (1977) for the proposition that a finding of unfitness or immorality is a prerequisite to termination of her parental rights.
We find no merit to these arguments. The record indicates that during the course of the taking of testimony, counsel for the mother made two objections based on the hearsay rule. The first of these objections, made during the testimony of a DPS social worker, was overruled on the grounds that the testimony was not being presented as proof of the truth of the matters asserted therein. The second objection was made near the close of all testimony, counsel for the mother objecting "to all hearsay with regard to the truth of these matters." This second objection, made in response to testimony already entered, was sustained "as far as going to the truth."
However, no motion to exclude the testimony, or to strike the answers, was made. Under these circumstances a waiver of the objectionable portions of the testimony *Page 1377 
is implied, Strickland v. Strickland, 285 Ala. 693,235 So.2d 833 (1970); and no issue of the hearsay testimony is presented for review. Wilkinson v. Duncan, 294 Ala. 509, 319 So.2d 253
(1975).
The fact that the testimony not excluded was hearsay
testimony would affect the weight, but not the admissibility, of that testimony. Moreover, we think the testimony and evidence discussed in detail supra would suffice to support the trial court's judgment under the statutory standard of "clear and convincing evidence" without the necessity of reliance on the contested testimony.
Nor can the trial court be put in error for refusing custody to the mother alone where, as here, such an award would have to have been based on conjecture that subsequent to the award the mother would establish a separate home suitable for raising Ricky. The trial court had before it a marital history of the mother which strongly indicated that this was not at all likely to occur.
Viewing the facts as they existed at the time of the rendition of the decree, the record supports the trial court's finding that the Millers are unable to provide a suitable and stable home environment for the child.
The fourth issue raised by the mother is that the petition upon which the termination proceedings were based was insufficient under Code of Alabama 1975, § 12-15-52 and § 12-15-65 (b). Section 12-15-52 (c) states in relevant part that, "[t]he petition shall set fourth with specificity: (1) . . . the facts constituting the dependency . . . and that the child is in need of supervision, treatment, rehabilitation, care or the protection of the state, as the case may be." Section 12-15-65 (b) states that parties "shall be informed of the specific allegations in the petition." The mother contends that the issue of insufficiency was raised by the parents' motion for summary judgment and their motion for more definite allegations, both of which were denied.
The petition filed by DPS states in relevant part:
 The said child is . . . Dependent . . . in that said child has been in the temporary custody of the Etowah County Department of Pensions and Security since 08-24-74. During this time, the parents have made no changes in their circumstances that would provide a proper environment for the child. They have not maintained contact with our agency regarding planning for the child. At the present time, their whereabouts are unknown. The last contact with either parent was 12-07-76. We request that permanent custody be granted the State Department of Pensions and Security for permanent planning, to include adoption.
We think the petition is sufficient to meet the requirements of § 12-15-52, and that there existed genuine issues as to material facts sufficient to justify denial of the Millers' motion for summary judgment. Moreover, the record reveals that the father was personally served with a copy of the petition filed by DPS. Consequently, we find no merit to this contention.
Lastly the mother contends that the court's order which terminated her parental rights and which awarded permanent custody to DPS is insufficient since it fails to comply with Code of Alabama 1975, § 12-15-65 (c) which requires that the court "record its findings on whether or not the child is a dependent child." The insufficiency complained of relates to the "immediate order" rendered orally by the trial court at the close of all testimony. However, the trial court's final, written order, quoted above, expressly finds that Ricky Lamar Miller is "neglected and/or dependent." Therefore we find no merit to this argument.
For the reasons above stated, the judgment of the trial court is affirmed.
AFFIRMED.
HOLMES, J., concurs.
WRIGHT, P.J., concurs in the result. *Page 1378