STUART, Justice
(dissenting).
I respectfully dissent. The trial court, following a proceeding at which evidence was presented ore tenus, granted the adoptive parents’ petition for adoption on two alternative grounds: that the father, F.P., had “impliedly consented” to adoption or that he had “relinquished” his claim to custody. The trial court terminated the father’s parental rights and granted the adoption petition. Adoption is a purely statutory proceeding, and the adoption statutes must be strictly construed. The Legislature has defined what constitutes “implied consent” to an adoption and has specifically provided that abandonment “includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.” § 26-10A-9(a)(1), Ala.Code 1975. When this Court issued its original opinion in this case, the Legislature had made no provision for the withdrawal of an “implied consent.” I did not believe it was the prerogative of this Court to write into the Adoption Code a provision the Legislature chose to omit. Since that date, the Legislature has amended § 26-10A-9 to provide specifically that “[i]mplied consent ... may not be withdrawn.”
While I believe the trial court correctly decided the issue whether F.P. gave his implied consent, I write to address other errors in the main opinion. I feel inspired, indeed compelled, to do so because of Justice Maddox’s special concurrence in Ex parte Beasley, 564 So.2d 950, 958 (1990), one of the very cases cited as authority in the main opinion, in which he explained why he was writing as follows: “[B]ecause dictum sometimes has a habit of growing full-blown into precedent, I felt compelled to express my views on the matter, in the hope that the rule of law will be corrected before it becomes entrenched.”[2] I will return to the merits of Justice Maddox’s writing later in this dissent.
This case was decided by the trial court following the presentation of ore tenus evidence. The ore tenus rule requires that an appellate court give special credence to the factual determinations of a trial court in a case in which-evidence is presented ore tenus and that it reverse the trial court’s judgment in such a case only where *140 the trial court’s decision is not supported by the evidence and is clearly and palpably wrong. That is not the case here.
The record in this case more than amply supports the trial court’s finding that F.P. abandoned the child, thereby impliedly consenting to his adoption; it further supports an order terminating F.P.’s parental rights. Significant facts found in the record are omitted from the dissenting opinion of Presiding Judge Yates, which the per curiam opinion adopts in part as the opinion in this cause. At best, Presiding Judge Yates’s dissent minimizes F.P.’s misconduct and portrays his actions in a most favorable light. The record can easily be read in a different light and when it is it completely supports the trial court’s ruling, thereby entitling its judgment to an affirmance. The dissent states:
“The mother testified that after she became pregnant she and the father ‘stopped having contact,’ but that she maintained contact with his mother. Both the mother and the paternal grandmother stated that the paternal grandmother drove her to several doctor’s visits for prenatal care, and the mother admitted that she had written a letter stating that she wanted the paternal grandmother to have custody of the child.”
857 So.2d at 119. The record reflects that F.P. stopped having contact with the mother in October 1998 after she told him she was pregnant. In fact, he shunned her. They went to the same school, but he ignored her. When an assistant principal/coach at the school confronted him about the mother’s pregnancy and about assuming responsibility for his child, he not only denied he was the father — he denied the mother was pregnant. The record indicates that F.P.’s mother drove the mother to two doctor’s appointments at the mother’s request. Rather than being confused about whether to place her child for adoption and give her consent to an adoption, the mother attended a meeting in the witness room at the Crenshaw County courthouse with an adoption counselor before the birth of the child. Present at this meeting with the natural mother and the counselor were the mother’s mother, the mother’s attorney, F.P., F.P.’s mother, F.P.’s brother, and F.P.’s attorney. After this meeting, at which F.P. expressed no opposition to the adoption, the mother gave her written consent to the adoption. The letter the mother wrote indicating that she wanted F.P.’s mother to have custody of the child was not written until March 20, 2000. In fact, F.P.’s mother requested the letter and told the young mother what to say. At the time of trial the mother was very clear that she wanted the adoption to proceed and that she thought having her child remain with the adoptive parents was in the child’s best interest.
The main opinion, quoting Presiding Judge Yates’s dissent, states:
“[The father] said that he had never seen his son. The paternal grandmother said that she (the grandmother), F.P., and the grandmother’s daughter had attempted to visit the child when it was born and were told that they could not see the child without the mother’s permission and were refused the visit. The father stated that he did not have any information on the adoptive parents other than a telephone number and that he had tried to reach them by telephone one week before the date of the trial. He said that he had never consented to the child’s adoption and that the mother had stated that she had been pressured into consenting to an adoption because the child was biracial. He stated that he wanted the child to be with his natural family regardless of the child’s race *141 and that through his family’s support he would be able to provide for the child while [the father] attended college. He stated that he had also fathered a child with his current 16-year-old girlfriend and that he was providing emotional and financial support to that mother and child. He said that he had never been convicted of any crimes; however, he admitted that had been suspended from high school for ‘passing a marijuana cigarette’ in the school bathroom.”
857 So.2d at 130.
The record reflects that F.P. tried to visit the child one time at the hospital. He was told the child had been returned to the nursery and that he could not see the baby at that time; he was never told that he could never see the child. He did not try to see the child or even to talk to the mother for three weeks after his attempted visit at the hospital. When he did have contact, he learned that the child was no longer with the mother. F.P. did not attempt to contact his child until the Saturday before the trial of this case on April 28, 2000 (10 months after the child’s birth). The adoptive grandmother, who was babysitting the child, answered the telephone when F.P. called; she told F.P. that the adoptive mother, whom he asked to speak with, was not home. F.P. did not call back. He made no other efforts to contact the adoptive parents or the child.
F.P. provided no emotional support to the mother; he provided no financial support to the mother or the child before or after its birth. He paid no birth expenses for the child. The main opinion, again quoting Presiding Judge Yates’s dissent, states: “He stated that he had also fathered a child with his current 16-year-old girlfriend and that he was providing emotional and financial support to that mother and child.” 857 So.2d at 130. The record indicates that this 16-year-old young woman was still his girlfriend at the time this appeal was filed and that he has provided less than $50 in financial support to her, the mother of his second child. His reason for failing to provide more financial support was that the young woman never asked for it.
The main opinion states that F.P. was suspended from school because he had passed around a marijuana cigarette in the school bathroom. The record indicates, however, that F.P. testified that he was passing some drugs for a friend but that no money was involved. He stated that he was suspended from school for that episode, but he also testified that he was expelled from high school during his senior year.
The main opinion, quoting Presiding Judge Yates’s dissent, states:
“The father’s witnesses included three siblings, who stated that they would assist him financially to support the child while he completed his college education; the paternal grandmother, who stated that she would care for the child in her home and wanted joint custody of the child; and two paternal aunts, who were retired, and who stated that they would provide child care. The judge stated in open court that each of the witnesses was capable of providing for the child.”
857 So.2d at 130-31.
F.P. originally sought custody for himself. Only on April 19, 2000, did he amend his petition to seek joint custody with his mother. A significant question is what F.P. actually proposes as living arrangements for his son. He proposes to have his son reside with his mother in her home — two hours from where he lives. The child will be cared for by relatives while his mother works. His mother and his older siblings will financially support the minor child. F.P. will go on with his *142 life, continuing with junior college and his part-time job. He states he will come home on weekends to visit his son. F.P. is not actually seeking custody for himself or assuming any of the responsibilities of parenthood; he is merely claiming the right of visitation with his child. “An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by the juvenile court.” § 12-15-1(17), Ala.Code 1975. The trial court properly rejected this proposal of “parenthood by others,” in which the natural parent plays a minor role, as being contrary to the best interest of the child.
Presiding Judge Yates’s opinion, adopted in all pertinent respects by the per curiam opinion of this Court, in condemning the majority opinion of the Court of Civil Appeals, states:
“The main opinion discusses the father’s failure to support the child and his failure to maintain contact or seek visitation with the child as a basis for terminating his parental rights. In this case, the trial court determined on January 5, 2000, that F.P. was the father; however, the trial court withdrew its order on January 19, 2000, and reset the case for a hearing to determine paternity. As in Ex parte C.V., [810 So.2d 700 (Ala.2001)] it appears that the court established paternity for the father when it simultaneously terminated his parental rights. During testimony, the court commented on the father’s ability to contribute to the child, stating, T can understand when the man doesn’t know where the child is that he can’t send a gift or child support.’ The only contact the father had with the adoptive parents was by a telephone call. I also question the father’s obligation to support the child once the prospective adoptive parents received the child into their home, filed a petition for adoption, and petitioned to terminate the father’s parental rights.
Justice Johnstone’s special writing [in Ex parte C.V.] stated, in part:
“ ‘To penalize the father for failing to contribute to the prospective adoptive parents after they revealed themselves and [the child] but while they did their utmost to deny and to terminate the father’s parental rights would be equally unfair.
“ ‘Additionally, once prospective adoptive parents have received an adoptee into their home and have filed a petition for adoption, a court “shall [enter an interlocutory order] delegating to the [prospective adoptive parents] (1) custody, except custody shall be retained by ... the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility of the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court.” § 26-10A-18. Therefore, once the prospective adoptive parents petitioned to adopt [the child] they assumed responsibility for his care and support, and, thus, relieved the father of any duty of support.’ ”
857 So.2d at 123-24.
The facts of the present case and Ex parte C.V., 810 So.2d 700 (Ala.2001), should not be confused, nor should dicta in a specially concurring opinion be deemed to be the law of this State. The adoptive parents in this case did not petition to terminate F.P.’s rights until April 14, 2000. In doing so they relied upon the provisions of the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, regarding the termination of parental rights. The above-quoted recitation by Presiding Judge Yates of Justice Johnstone’s special writing in Ex *143 parte C.V. serves to perpetuate erroneous declarations of the law of this State.
Although I believe it was also true before the amendment, clearly the amendment of § 26-10A-9, Ala.Code 1975, requiring a putative father to support his child before the child’s birth dispels any previously held notion that a putative father has no obligation to support his child until his paternity is established and he is placed under a court order to pay child support. This portion of the opinion further erroneously asserts that the father has no obligation to support his child or to visit his child after the entry of the preliminary custody order in an adoption proceeding and before the entry of an order terminating his parental rights. Alabama law is clearly to the contrary. Legal custody is defined by § 12-15-1(17), Ala.Code 1975, as:
“A legal status created by court order which vests in a custodian the right to have physical custody of the child and to determine where and with whom the child shall live within the state and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, clothing, education, and ordinary medical care, all subject to the powers, rights, duties, and responsibilities of the guardian of the person of the child and subject to any residual parental rights and responsibilities. An individual granted custody shall exercise the rights and responsibilities personally unless otherwise authorized by the juvenile court.”
(Emphasis added.)
Further evidence of this requirement are the statutory provisions of the Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, and the Child Protection Act. The Alabama Adoption Code states: “A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent: ... (3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.” § 26-10A-9, Ala.Code 1975. (Emphasis added.) The Adoption Code defines “adoptee” as: “[t]he person being adopted.” § 26-10A-2(2), Ala.Code 1975. The Child Protection Act sets forth the factors a court should consider in determining whether to terminate parental rights. In addition to the factors that may be considered in all termination-of-parental-rights cases, subsection (b) of § 26-18-7, Ala.Code 1975, provides:
“Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
[[Image here]]
“(3) Failure by the parents to maintain consistent contact or communication with the child.
[[Image here]]
The main opinion, adopting Presiding Judge Yates’s dissent, continues: *144 857 So.2d at 134-35. The main opinion then quotes Ex parte Beasley. In Beasley Justice Maddox, in a special concurrence, wrote:
*143 “In T.S. v. J.P., 674 So.2d 535 (Ala.Civ.App.1995), we held that in order to terminate parental rights in a pending adoption case, the court must determine whether grounds for termination exist, including, but not limited to, those specifically listed in the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, and must also determine whether all viable alternatives to termination of parental rights have been considered....”
*144 “I concur in the result reached, but I disagree with that portion of the opinion that states that there must be a ‘finding of dependency’ when the State or a non-parent is the petitioner. The Uniform Child Protection Act of 1984 makes no such requirement, and the cases of this Court and the Court of Civil Appeals that construe the Child Protection Act to make such a requirement are clearly wrong and should be overruled.
[[Image here]]
“The Uniform Child Protection Act of 1984, in my opinion, changed that procedure. It is a comprehensive act that now provides for the procedure and the substantive grounds that must be proved in a termination of parental rights case, such as: (1) the person or entities who may file a petition (Ala. Code 1975, § 26-18-5), (2) the procedure to be used for consideration of such petitions, and (3) the grounds that must be alleged and proved.”
564 So.2d at 955-56. Justice Maddox correctly pointed out that the requirement that there be a “finding of dependency” is not found in the statute. He noted: “The majority finds this requirement outside the statute and engrafts it onto the statute.” 564 So.2d at 957.
Although Justice Maddox did not discuss it in his writing in Beasley, the same analysis applies to the so-called second prong of the test in termination-of-parental-rights cases, i.e., whether “all viable alternatives to termination have been considered.” This requirement is not contained in the Child Protection Act nor in any statutory provision of Alabama law. Just where does this language, “consideration of all viable alternatives to termination,” originate? It appeared originally in child-abuse and neglect cases involving the Department of Human Resources. Some early cases state that parties pursuing this argument cited an unusual federal case, Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976), as authority. Alabama courts have stated that they will not be bound by the criteria set forth in Roe, but have stated that “[t]he trial court, in determining the best interests of the children, looks at several factors. Less drastic measures than permanent removal of custody from the mother is such a factor the trial court should consider.” Lovell v. Department of Pensions & Sec., 356 So.2d 188, 190 (Ala.Civ.App.1978). The Lovell court continued: “[t]he trial courts of Alabama, in determining the best interest of children, should look to viable alternatives before terminating parental rights.” Id. Over the years the phrase was repeated, omitting the phrase “in determining the best interest of the children.” It was changed from one of several criteria to be considered to the second prong of a two-pronged test and, again without analysis, it was applied to termination-of-parental-rights cases not involving the State or the Department of Human Resources. While such a factor might be a consideration where the Department of Human Resources has removed a child from the custody of its parents, that same argument does not apply equally in the case of the adoption of an infant. Furthermore, it is simply not part of the statutory scheme adopted by the Legislature in the Child Protection Act; its continuation is by judicial engraftment only and is wrong.
As the main opinion notes, since this Court issued its original opinion in this case, the Legislature has amended the Alabama Adoption Code; those amendments were effective April 17, 2002. See Act No. 2002-417, Ala. Acts 2002. The amend *145 ments clarified the original intent of the Legislature and corrected this Court’s misinterpretation of the statutes expressed in the original opinion issued in this case. The Legislature expressly made all of the Act, including the amendment to § 26-10A-9, which include both the prebirth-abandonment provision and the provision making implied consent irrevocable, retroactive to January 1, 1997. The majority refuses to apply Act No. 2002-417 retroactively in this case, holding that the father had a vested right before the amendment became effective. I believe the majority errs; however, as I have stated I believe the trial court properly found that F.P. gave his implied consent to adoption and properly terminated F.P.’s parental rights under the law as it existed prior to the recent amendments.
The main opinion, lastly, states:
“Finally, we address the contention that the father abandoned the child after its birth. Postbirth, the father had a justifiable excuse for failing to establish a relationship with the child — the adoptive parents did not wish to allow him to do so. The definition of abandonment in § 26-18-3(1), a part of the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, which we read in pari materia with § 26-10A-9(3), a part of the Adoption Code, recognizes excuse as a basis on which to avoid abandonment. We hold that the father did not abandon the child, either before or after its birth; therefore, he did not impliedly consent to the child’s adoption.”
857 So.2d at 138. Act No. 2002-417 provides:
“ § 26-10A-18.
“Once a petitioner has received the adoptee into his or her home for the purposes of adoption and a petition for adoption has been filed, an interlocutory decree shall be entered delegating to the petitioner (1) custody, except custody shall be retained by the Department of Human Resources or the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility for the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court. This interlocutory decree shall not stop the running of time periods prescribed in Section 26-10A-9.”
Section 26-10A-9 provides:
“(a) A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
“(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
“(2) Leaving the adoptee without provision for his or her identification for a period of 30 days.
“(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
“(4) Receiving notification of the pen-dency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days.
“(5) Failing to comply with Section 26-10C-1.
“(b) Implied consent under subsection (a) may not be withdrawn by any person.”
Even applying Act No. 2002-417 prospectively only, this Court has no authority to *146 find F.P.’s failure to pay support and to maintain communication or to otherwise maintain a significant parental relationship with the adoptee following his birth excused.
The trial court’s order is supported by clear and convincing evidence; the decision of the Court of Civil Appeals should be affirmed. The reversal of the judgment of the Court of Civil Appeals by the majority necessitates a remand of this case to the trial court, which will now be required to consider to whom custody of the minor child should be awarded and what visitation should be ordered. If appropriate, the award of child support, retroactive child support, and the payment of the child’s birth and medical expenses must also be addressed. The “best interest of the child” standard will be applicable. See § 26-10A-24, Ala. Code 1975. The trial court must consider F.P.’s prebirth and postbirth conduct as well as the minor child’s present situation.

. Justice Maddox quotes Justice Jones, writing for the majority in Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), who recited the "Primeval Calf” by Sam Walter Foss. 564 So.2d at 958 n. 7.